There are two issues in this case of primary importance. The first is whether the second ALJ in this case, ALJ Hyatt, met his burden of proving continuing disability in a cessation case. The second issue, which may not need to be reached depending on the findings of this court in the first issue, is whether two of the jobs that were proffered by the V.E. were unsuitable for the plaintiff in light of the ALJ's own findings in his residual functional capacity analysis. Let me ask you about the second issue, if I may. I take it that the two jobs that you're contending she cannot do are the photo finisher job and the order taking job. That's correct, Ms. Griddle. And you are essentially conceding, if we reach issue two, that the findings do not preclude her doing the system monitor job, but you have other issues about whether there are enough of those. Well, no, I'm actually not going to concede that what I'm raising is the problematic nature of whether or not she can do surveillance system monitor work. It must be remembered that the Dictionary of Occupational Titles was last updated in 1977, and the job of surveillance system monitor is very different today than it was then. It now involves more use of the hands, and obviously I'm not a vocational expert, but vocational experts are likely to testify that the job has changed. It involves different electronic controls and there is some use of the hands. That would need to be returned to the ALJ to make those So what I'm proposing here is that if this Court finds, as it should, that two out of the three jobs are just outside of what the ALJ himself designated as her functional capacity, the findings of fact as to, first of all, whether or not she can do surveillance system monitor as it exists today, and secondly, whether there are enough jobs in the national economy. You want a remand for that? I would like a remand for that, but I would also like this Court to find, as to the first issue on continuing disability, that the ALJ did not support his burden to prove a continuing disability. The presumption of continuing disability is on the agency, and in order to do that, you must have a point-by-point, element-by-element analysis. Is there any question that the ALJ could credit the vocational expert when the vocational expert disagreed with the Dictionary of Occupational Titles on what the job requirements are? If the VE supports his or her testimony, Johnson v. Shalala says No, you used an abbreviation. I'm sorry, the vocational expert? No. VE. I'm sorry, there are a lot of acronyms. Oh, I hate English because I'm not a specialist. Right, right. The vocational expert must support any deviations from the Dictionary of Occupational Titles, commonly abbreviated as the DOT, with factual and scientific support. That doesn't answer my question. If the Dictionary of Occupational Titles says one thing about what the job requirements are, and the vocational expert says another, can the ALJ buy what the vocational expert says and reject what the Dictionary says? Only if the vocational expert has supported their assertions with factual observations and evidence supporting their deviation, and that's the Johnson v. Shalala case. So, in other words, you're saying it's not enough for the VE to say, the vocational expert to say, the Dictionary of Occupational Titles says frequent use of hands, but it's really only occasional use of hands, and that that's not enough unless there's a further explanation. I've been doing this for 20 years, and I've seen X, Y, and Z. Exactly. They'd have to comment on their personal observations in the field, on studies they've read, on analysis or research that has been done in sight to those reports. It seems funny that we'd be that tough on the vocational expert when, as you yourself point out, the Dictionary of Occupational Titles is obviously technologically out of date. Right, and you would hope that a vocational expert would be keeping up with the developments in their field and would be able to cite to recent research and findings and their own observations in the field if they can. Let me ask you this, assuming, again, that we get to this second stage, and assuming we agree with you that the system monitor has to go back because there's insufficient information, if we did that, why wouldn't we send everything back for the vocational expert to have an opportunity to explain why their opinion differs from the Dictionary of Occupational Titles on the other two positions and just remand the whole thing for more complete discussion by the vocational expert? Right, that would be a possible remedy, although I would put it to this Court that you are able to find, as a matter of law, that she cannot perform those jobs simply because they're outside of her RFC. Actually, it's not a matter of law. You would make those findings a fact for yourself based on the facts that are already in the record. So the Beneke case basically says that you don't need to remand to obtain further vocational testimony when it's clear from the record that the claimant could not do any of these jobs. It's just duplicative administrative proceedings that just further delay the receipt of benefits for claimants that have been waiting for years and years and years, as this woman has been waiting. And also to point out that this is a woman with a lot of medical problems. She was diagnosed with fibromyalgia. Some of which the second ALJ did not find entirely credible. Right, and that also, if it goes back for a hearing, it would be de novo and those issues could be raised again. There's been quite a bit of work done on the issue of fibromyalgia in the past couple of discussed in my briefing. If she's diagnosed by a rheumatologist who is the relevant treating specialist in this field, as she was at the rheumatology clinic. She didn't have the points for fibromyalgia. She had 16 out of 18 of the points. She didn't have enough of the points. Oh, yeah. And it was Dr. Paiva at the OHSU Rheumatology Clinic, which is under the supervision of Dr. Robert Bennett, who is well known as one of the foremost in the world treating clinical researchers in the field of fibromyalgia. He's written extensively. Counsel, let me interrupt your explanation of his resume. Sure. I took a look at Johnson, the case you relied on. It doesn't seem to say what you said it says. It's a little bit of... What it says is the DOT is not the sole source of admissible information. The secretary may take administrative notice of any reliable job information, including the services of a vocational expert. The DOT states that it's not comprehensive. And you make explicit here that the ALJ may rely on expert testimony, which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation. It does not limit what the persuasive evidence is so far, as I can tell. And the holding of the case is that it was proper to rely, for the ALJ to rely on the expert contradicted the DOT. Right. It's close to the opposite. It's not as clear as I would have liked it to have been, but I'd be happy to do some supplemental briefing to you on that case. There's one little bit in there that does say that there must be some supportive evidence, and I don't, unfortunately, have the case at my fingertips today to give you that picture. Are you also relying on Social Security Regulation 00-4-8? Yeah. Well, I don't have that at my fingertips either. I'm sorry. It came out in 2000. Yeah. That's after the Johnson case. Well, it assumes that ALJ must elicit a reasonable explanation for the conflict. Right. Thank you. That's correct. What about her concentration? The ALJ did not make a finding one way or the other. Right. And that's one of the B criteria. The concentration, persistence, or pace. This is where, just going back, and I hope I can reserve a little bit of time, going back to our first issue in this case, whether the ALJ overcame the continuing presumption of disability. The elements of criteria B of Listing 1207, there are four things in there. There are the activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation. Back when ALJ Evans made his finding of disability, at that time, the law required he find three out of those four. It changed, and Judge Hyatt only had to find two. We don't know which three ALJ Evans found because that form is not in the record. So my point is, how do we know that this proper analysis was made when we don't see the elements that Judge Evans identified? I see my time is up. Thank you. Thank you, Counsel. Good morning, Your Honors. May it please the Court, Jamala Edwards, representing the Commissioner for Social Security. We would submit that this case here is a case about credibility, and a case where this is a claimant that now feels entitled to disability benefits. Now, disability benefits is not an entitlement. It is a benefit that's offered by the government, and something that has very specific requirements and terms to meet that. Now, the agency has the prerogative and the duty to do a continuing disability review to see if improvement has occurred with a particular claimant. A claimant cannot be on benefits forever and ever and ever without kind of a checkup, so to speak, by the agency. Can you walk me through that? Because my concern is that I got the feeling that the ALJ here, that it's really the third one, because there was a first one who gave her benefits. Right. There was the second one, and then there was the remand by the Appeals Counsel, and then the third one. Somehow I got the feeling that he didn't say, okay, here's the reasons that she was found disabled, and here's how she's improved. Rather, it almost looked like he did a de novo where he just said, look, she's not disabled. Almost like he disagreed with her getting disability benefits from the start. Well, actually, the ALJ Hyatt talks several times about a comparison point and how the claimant has improved on Transfer Site 27. He talks about the claimant's condition improved since the comparison point. The claimant once met Listing 12.07, and I would disagree with Ms. Harshman's counsel in that the ALJ did very specifically talk about, well, this is what Listing 12.07 requires, and went through specifically the A criteria and the B criteria, said, well, she no longer has problems with vision. She no longer has problems with her speech. Her concentration is not significantly limited. That's all the A criteria, which was found originally by. He didn't show that there was any improvement. He just said that she doesn't have these problems. Well, he said that there was improvement because at the time ALJ Evans found that that was disabling for Ms. Harshman. Then ALJ Hyatt actually cites to the record where there's been improvement and shows that. He cites what he calls later evidence. Right. Later evidence. Well, actually, part of the reason why the ALJ Hyatt found that the claimant was no longer disabled was that there was really a lack of treatment during the period between 1993 and 1997, which was the cessation date. We have during those four years really only two evaluating examinations. One was a rheumatology, and one was an evaluating psychological evaluation for the agency. Was she living on the streets during part of that time? No, she wasn't. No, actually, the record also talks about significant activities of daily living that she was doing. Doing her home remodeling. That's right. Right. She has ten cats that she's taking care of. Smaller than the horses we heard about last time. Right. Exactly. She's volunteering time. Another one is living on the streets. That's right. With so many of these, it's hard to keep them straight. Right, right. And so we went through all of the evidence, and the lack of medical treatment during the time is very telling, especially for someone who has 12.07, which is somatoform disorder, which is someone who would be seeking treatment. What do you do with that? He said that she could do three jobs. Right. One was the food service clerk. The other one was the photo finisher. And then there's the surveillance. Okay. Isn't it pretty clear that at least for two of them, the food service clerk and the photo finisher, that given the findings of the administrative law judge, that she doesn't meet the definitions of the DOT of those jobs? And the VA never said, well, here's the job that's different, and here's how she could meet it? Well, actually, we would disagree. We would say that the RFC says that she could occasionally use her hands and manipulate, she can occasionally rotate her neck, and photo finisher, the counterclerk position, only requires occasional manipulation. If you look at the selected characteristics of occupations defined in the revised DOT, which the regulation that was referenced earlier, 004P, I guess, says we're to look at, doesn't that say that it's frequent reaching, frequent handling, and frequent fingering required of both the photo finisher and order taker? Well, we would actually say the counterclerk is the more precise of what the VE was referencing, and that manipulation was only occasionally present in the counterclerk position. There are two jobs I'm thinking of, and I'm a little confused with the photo finishing. There's the person that is at the counter, and they take people's film, and they take their money and give them their change, and then there's another person who puts his or her hands in a changing bag, unloads the film from the roll, and puts it onto the device that takes the film into the developer. Right, and we're submitting that it's actually the counterclerk, the person who takes the money, stands at the counter, and has these limited manipulation is what the VE was really referencing during the hearing. Also, with regard to the food and order clerk, it is actually described as a physically demanding job, which would be above the ALJ reference. But also, within that DOT description, it says that a particular worker may be only designated to taking monies, taking orders, and to that very limited function. So we would say that the DOT actually contemplates a deviation from the heavily demanded work, physically demanded work, to a more limited collecting monies. Let me ask you about something that troubles me here, and I really don't know how to approach it. My experience is with personal injury litigation in the traditional court system. I never in law practice handled a Social Security case. Now, the ALJ wrote that this woman was not entirely credible, and that one of her doctors, and you hardly ever see this in a medical file, Dr. Starr noted some evidence suggestive of malingering and secondary gain. Secondary gain means you claim the disease in order to get the money, or some other benefit such as not doing chores or something like that. Secondary gain is shown by variable performance with improved functioning when you question her ability to manage money. Now, in a traditional court system, the jury would be invited to discount what the doctor said because the doctors would testify that they relied on the patient's report of when she felt pain, how much pain she felt, when she had these or the other feelings that are symptomatic of the disease. Basically, if she lies to get money, then the doctor's diagnoses that are based on what she tells them become unreliable. You don't use exactly the same reasoning in the Social Security cases, and I'm wondering what to make of the ALJ's determination that she was not entirely credible and notes that the medical report by the doctor showed evidence suggestive of malingering and secondary gain. Right. What do we do with it? Well, in Social Security, we would actually, had that particular doctor, Dr. Starr, said, I find her very disabled, she has this problem and that problem, we would give it less weight based on the fact that she was also found to be malingering or secondary gain issues were present because we would say, well, the subjective testimony is based on her allegations and her allegations are not entirely credible as found by that doctor. Well, in this particular case, Dr. Starr was actually, his findings were consistent with the ALJ's findings, and the ALJ accepted Dr. Starr and accepted his findings, including that she was malingering or there was possible malingering and the secondary gain issues. Dr. Starr actually, or the ALJ found that Dr. Starr had seen her in 1997 and then again in 2002 and gave great weight to Dr. Starr because he felt it was a, they had a longitudinal relationship where now someone has seen someone five years later, he said, the record has not substantially changed. I find her pretty much the same as I did in 1997. And so the ALJ said, well, that's a really good picture of a person who has, you know, not done a lot of treatment, continued to have the same level of activity in her life, and this doctor has seen her over that period of time. In fact, he was not the only doctor. Dr. Allen in 1997 also indicated that there was possible secondary gain issues with this claimant. In fact, Dr. Starr said when I gave her a math equation, she had trouble doing it, trouble with the serial sevens, one of the tests. And then when I said, well, this is to find out whether you can manage your money from Social Security, she was then all of a sudden able to do the math equation. So we would submit that the ALJ did rise above the presumption of continuing disability to show this claimant was no longer disabled. Thank you. We went through all your time, but I'm going to give you 30 seconds anyway, just in case you want to offer some rebuttal. I'll give you 30 seconds. I'll talk fast. Judge Kleinfeld, I wanted to address your concerns about malingering and secondary gain. First of all, the issue of secondary gain, Social Security benefits cases are all about secondary gain. Claimants are trying to obtain monetary benefits to survive. So the other thing that I want to point out is that Dr. Starr did not find that Ms. Harshman was malingering. It was a suggestion of malingering. So it's a big difference there. And it's also very important to point out that in 2002, the second psych eval of her, he did not find malingering. He did not mention malingering at all. So I hope that addresses your concern on that point. I see my time is up, and I thank you. Thank you, counsel. Harshman v. Barhart is submitted.
judges: Kleinfeld, Graber, Moskowitz